UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NORWEGIAN BULK TRANSPORT A/S                CIVIL ACTION

VERSUS                                      NO.  05-1978

INTERNATIONAL MARINE TERMINALS             SECTION "R" (3)
PARTNERSHIP AND IMT STEVEDORES
CO.

## ORDER AND REASONS

This is an action brought by Plaintiff, Norwegian Bulk Transport, A/S, against Defendant, International Marine Terminals Partnership, for breach of a maritime contract and tort.  Both parties have filed cross motions for summary judgment in this matter.  For the following reasons, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's cross-motion.

## I.    BACKGROUND

Plaintiff Norwegian Bulk Transport is a foreign vessel operator based in Bergen, Norway.  On March 19, 2004, NBT entered into a time charter agreement with Bulkhandling Handymax, AS, an entity located in Oslo, Norway.  The agreement called for NBT to

become the time charterer of the shipping vessel, M/V
Unterwalden, upon delivery by its owners, Bulkhandling.  After
the voyage, but not by a specific time, the vessel was to be
returned to its owners at a safe port anchor on the Mississippi
River, most likely Nine Mile Anchorage.  (Def.'s Ex. B, at Clause
75).  As part of the agreement, NBT agreed to pay Bulkhandling
$28,750 per day including overtime for use of the vessel.

On the same day that NBT signed the time charter agreement
with Bulkhandling, NBT entered into a voyage charter agreement
with Eramet Comilog North America, Inc., under which Eramet would
use the vessel for the transportation of about 40,000 metric tons
of manganese ore.  The ore was to be delivered to the location of
Defendant International Marine Terminals Partnership.  IMT owns a
dry bulk cargo offloading and transfer facility on the banks of
the Mississippi River near Myrtle Grove, Louisiana.  At the time,
IMT and Eramet were already parties to a transfer agreement that
called for IMT to offload ore from Eramet's vessles to open
barges at a rate of 12,000 metric tons per day.  (Def.'s Ex. D).
The transfer agreement also stated that "IMT will reimburse
Eramet for vessel demurrage incurred resulting from IMT's failure
to perform as listed above."  (*Id.*).

The parties agree that on May 2, 2004, the M/V Unterwalden
arrived at the IMT Terminal in Myrtle Grove at 6:00 a.m.  The

parties further agree that IMT began offloading manganese ore at 6:45 p.m. that day and finished at 1:40 a.m. on May 5, 2004. Because the M/V Unterwalden was carrying 39,755.42 metric tons of manganese ore, the transfer agreement between IMT and Eramet required IMT to complete offloading operations and any necessary repairs within 3.31 "lay days" in order to fulfill its contractual obligations. (Decl. of Scott C. Becnel, at ¶ 4). IMT used only 2.28 days to finish offloading the vessel, thus 1.03 lay days remained under the transfer agreement.

At some point during the offloading of the vessel, IMT caused the vessel to be damaged. IMT started to make necessary repairs while the vessel was still docked at Myrtle Grove. After completion of the offloading, the captain of the vessel asked IMT to permit the vessel to leave IMT's dock and travel to Nine Mile Anchorage. IMT agreed to this request because it could complete the repairs at Nine Mile Anchorage.

At 3:35 a.m. on May 5, 2004, the M/V Unterwalden departed for Nine Mile Anchorage, where it arrived at 6:30 a.m. that same day. Upon arrival at Nine Mile Anchorage, the vessel took on bunkers (*i.e.*, fuel), a process that it completed at 12:40 p.m. that afternoon. IMT personnel finished the repair work at 9:25 p.m. At this point, .20 lay days remained under the transfer agreement. If the time required to sail to Nine Mile Anchorage

3

and to take on bunkers is not included, .57 lay days would have remained under the transfer agreement at the time IMT finished the work it was contractually obligated to perform.  Eramet has not invoked the demurrage clause in its Transfer Agreement with IMT.

NBT sued IMT, asserting that the repairs done by IMT at Nine Mile Anchorage prevented NBT from returning the vessel to its owners, Bulkhandling, at 6:30 a.m. when the vessel first arrived at Nine Mile Anchorage.  As a result, NBT allegedly incurred expenses of $19,680.79 for the additional 14 hours and 55 minutes of charter hire that it was charged before it returned the vessel to its owner at 9:25 p.m.  Both IMT and NBT now move for summary judgment.

## II.  TIMELINESS

As an initial matter, plaintiff opposes defendant's motion for summary judgment on the grounds that it is untimely.  The Court required pretrial motions in this action to be filed and served in sufficient time to permit them to be heard no later than July 26, 2006.  Under Local Rule 7.2E, all civil motions must be filed "not later than the fifteenth day preceding the hearing date."  Plaintiff contends that all motions had to be filed by July 11, 2006.

4

Rule 16 of the Federal Rules of Civil Procedure gives this Court broad discretion over scheduling matters. (See Fed. R. Civ. P. 16(b)). Under the Court's scheduling order, the motion for summary judgment was due by July 11, 2006. Defendant filed the motion on July 25, 2006, and missed the deadline. The Court nevertheless finds that it is in the interests of justice to allow defendant to submit the motion for summary judgment. The period of time between the deadline and when the Defendant actually filed was minimal, and the plaintiff does not demonstrate that this two-week delay significantly prejudiced it in any meaningful way. Therefore, the Court excuses defendant's delay in submitting the motion for summary judgment.

## III. LAW AND DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v.*

5

*Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial.  *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

**B.   Analysis**

Defendant IMT moves for summary judgment based on two independent grounds.  First, IMT argues that under *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927), maritime law precludes NBT's claims for economic damages in this action because NBT does not own the property that sustained physical

6

damage, nor does it have a contract with IMT with respect to the property.  Second, IMT asserts that general maritime law precludes NBT's claims because IMT had free use of the vessel for the entire period of lay days it was accorded under the transfer agreement with Eramet.

*Robins Dry Dock* established the principle that in the absence of a contract, a time charterer may not recover from a docking company for loss of use of a vessel damaged by the docking company, as the charterer does not own the vessel and suffers no physical damage to its own property.  In *Robins*, the employees of a dry dock negligently damaged a vessel during ordinary maintenance.  The vessel was subject to a charter agreement at the time, so the damage deprived the charterer of the use of the vessel.  The charterer did not have to pay the vessel owners charter hire while the repairs took place, but the charterer still sued the dry dock for loss of use of the vessel as a result of the extra time needed to repair the damage.  The Court denied the charterer's claim because it was not an intended beneficiary of the drydocking contract between the vessel owners and the dry dock, and because no tort claim arose simply because the charterer had a contract with the vessel owners.  Justice Holmes wrote, "[A]s a general rule, at least, a tort to the person or property of one man does not make the tort-feasor

7

liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong." *Id.* at 309.

The Fifth Circuit continues to apply the *Robins Dry Dock* principle to most maritime cases, carving out an exception only for cases involving a collision between two vessels not in privity of contract. *See Amoco Transport Co. v. SS MASON LYKES*, 768 F.2d 659 (5th Cir. 1985). In *Amoco*, the SS MASON LYKES collided with the M/V AMOCO CREMONA, seriously damaging both vessels. The MASON LYKES was carrying cargo that was not damaged in the accident, but the cargo had to be moved from one ship to another in order to continue its transport, which resulted in higher costs for the cargo owners. The Fifth Circuit held that the cargo owners could proceed in tort against the owners of the AMOCO CREMONA to recover those extra costs, even though the cargo owners suffered only economic losses and were not owners of the damaged vessel. *Id.* at 668. In the collision context, the Court found that the vessel owner and the cargo owners were engaged in a common venture, in which they shared the risks of the voyage, and thus the cargo owners could recover economic losses. *Id.*

Since the *Amoco Transport* decision, the Fifth Circuit has acknowledged that it has not recognized exceptions to the rule in *Robins Dry Dock* outside of the context of collision cases. *See,*

8

*e.g.*, *Cargill, Inc., v. Doxford and Sunderland, Ltd.*, 785 F.2d 1296, 1298 (5th Cir. 1986) ("Even if the traditional rule – permitting cargo to proceed directly against a non-carrying tortfeasor for damages arising from an injury to the carrying ship - were extended to non-collision cases, an extension that we do not here adopt or endorse..."). NBT argues that two decisions in this district reflect an expansion of the *Amoco Transport* exception to non-collision cases. *See Ferromet Resources, Inc. v. Chemoil Corp.*, 1992 WL 142411 (E.D. La. June 9, 1992) (McNamara, J.); *Showa Line, Ltd. v. Diversified Fuels, Inc.*, 1991 WL 211527 (E.D. La. Oct. 1, 1991) (Arceneaux, J.). Those decisions however do not guide the Court's analysis in this case. In *Ferromet Resources*, the defendant's actions were intentional, not negligent, and the defendant was aware of the plaintiff's contract with the owner of the vessel. 1992 WL 142411, at *1. In *Showa Line*, Judge Arceneaux relies only on collision cases to find that the plaintiff may be able to recover for loss of use. 1991 WL 211527, at *1. The plaintiff also alleged fraud and an intentional tort, "taking the claims out of the *Robins Dry Dock* parameters as well." *Id.* Because the Fifth Circuit has not expanded the *Amoco Transport* decision to cases outside of the collision context, the Court finds that this case is governed by the principle of *Robins Dry Dock*.

9

Furthermore, the facts of this case closely mirror those in *Robins Dry Dock*, making it proper to apply the *Robins Dry Dock* principle here.  In both cases, the plaintiff was not the actual owner of the vessel, but instead sought damages for loss of use of a vessel it had chartered.  If anything, the plaintiff in this case was even more removed from the defendant than in *Robins Dry Dock*, since Eramet served as an intervening charterer between NBT and IMT.  Additionally, just as the dry dock company in that case was unaware of the existence of the charter party, IMT was also unaware of any agreements among other parties besides the transfer agreement it had with Eramet, an agreement with which IMT complied.[1]  (Decl. of Scott C. Becnel, at ¶ 5).

As a result, it is commercially unreasonable to subject IMT to two different sets of performance expectations – the one set

---

[1] IMT complied with its agreement with Eramet because it completed both offloading and repairs within the 3.31 lay days provided in the contract.  IMT had free use of the vessel during lay time. *See, e.g., Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co., Inc.*, 611 F.Supp. 665, 671 (D.N.J. 1985); *Intercon. Trans. Co. v. India Supply Mission*, 261 F.Supp. 757, 758 (S.D.N.Y. 1966).  Thus, when IMT completed all discharge operations and repairs before the expiration of the 3.31 lay day period, it complied with its contract with Eramet. NBT mistakenly relies on *NOLISEMENT (Owners) v. Bunge & Born*, (1917) 1 K.B. 160, for the proposition that IMT lost control of the vessel once it completed offloading operations.  As the Southern District of New York noted, that holding was based on a "separate and specific clause in the charter party," not on a general principle of maritime law.  *Intercon. Trans. Co.*, 261 F.Supp. at 759.

forth in the transfer agreement that IMT followed, and another created after-the-fact by a party whose existence was unknown to IMT during its performance of offloading operations.  Further, NBT had the opportunity to protect itself against losses of this nature when it negotiated its voyage charter agreement with Eramet, and it did not do so.

Allowing NBT to recover damages against IMT would vitiate the policy behind *Robins Dry Dock*, namely the prevention of widespread rippling out of liability that can occur if suits in tort are permitted without pragmatic limitations.  The Supreme Court established such a limitation in maritime law, and this case fits squarely within it.  As such, under *Robins Dry Dock*, IMT is entitled to summary judgment as a matter of law.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's cross-motion.

New Orleans, Louisiana, this 31st day of August, 2006.

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

11